**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 12-cv-01100-MSK

**DAVID REYNOLDS,**

        **Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting Commissioner of Social Security,**

        **Defendant.[1]**

---

**OPINION and ORDER**

---

**THIS MATTER** comes before the Court on Plaintiff  David Reynolds's appeal of the Commissioner of Social Security's final decision denying his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83c.  Having considered the pleadings and the record, the Court

      **FINDS** and **CONCLUDES** that:

**I.**      **Jurisdiction**

      Mr. Reynolds filed claims for disability insurance benefits and supplemental security income, asserting that his disability began on June 1, 2009.  After his claims were initially

---

[1]  At the time Mr. Reynolds filed his appeal, Michael J. Astrue was the Commissioner of Social Security.  Carolyn W. Colvin is substituted as the Defendant in this action to reflect her designation as Acting Commissioner of Social Security, effective February 14, 2013.

denied, Mr. Reynolds filed a written request for a hearing before an Administrative Law Judge ("ALJ"). This request was granted and a hearing was held on March 3, 2011.[2]

After the hearing, the ALJ issued a decision with the following findings: (1) Mr. Reynolds met the insured status requirements of the Social Security Act through December 31, 2012; (2) he had not engaged in substantial gainful activity since June 1, 2009; (3) he had two severe impairments: affective disorder and a history of alcohol abuse; (4) neither of these impairments, considered individually or together, met or were equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1 ("the Listings"); (5) Mr. Reynolds had the Residual Functional Capacity ("RFC") to perform a full range of light work except that he was limited to unskilled work requiring General Educational Development ("GED") levels no higher than Reasoning 2, Math 1, and Language 1;[3] (6) he was unable to perform any of his past relevant work; and (7) he was not disabled because he was able to perform other jobs in the national economy, including food service worker, maid, and parking lot attendant.

The Appeals Council denied Mr. Reynolds' request for review of the ALJ's decision. Consequently, the ALJ's decision is the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011). Mr. Reynolds' appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 42 U.S.C. § 405(g).

---

[2] Initially, the hearing was scheduled for November 2010. The hearing was continued to March 2011 in order to obtain additional records.

[3] According to the *Dictionary of Occupational Titles*, GED "embraces those aspects of education (formal or informal) which are required of the worker for satisfactory job performance."

## II.      Issues Presented

Mr. Reynolds raises five challenges to the Commissioner's decision: (1) the ALJ failed to account for all the mental limitations contained in Dr. Benson's opinion; (2) the ALJ failed to account for the mental limitations found to exist at Step 3; (3) the ALJ failed to account for the mental limitations in Dr. Rodriguez's report; (4) the ALJ did not properly assess Mr. Reynolds' credibility; and (5) the ALJ did not give proper reasons for discounting the credibility of Dr. Rodriguez's opinion.  As Mr. Reynolds challenges all relate to the ALJ's RFC finding at Step 4, the Court does not address Steps 1, 2, 3, and 5.

## III.      Material Facts

Having reviewed the record in light of the above issues, the material facts are as follows. Mr. Reynolds worked consistently from 1992 to 2007, but asserts that he was unable to work after 2007 due to memory and concentration problems, as well as problems interacting with people.  The record contains no evidence of treatment for these problems and no evidence of diagnosis prior to June 2009, when Mr. Reynolds filed his disability benefits claim.

As part of his application for disability benefits, Mr. Reynolds was examined by a number of medical consultants, including Dr. Benson, Dr. Rodriguez, Dr. Wharry, and Mr. Gard. Dr. Benson, a consulting psychologist, examined Mr. Reynolds in August 2010.  Based on this evaluation, he diagnosed Mr. Reynolds with a learning disorder, borderline intellectual functioning personality disorder, and prominent avoidant and schizotypal personality traits.  He also made several conclusions regarding Mr. Reynolds' functional capacity: (1) Mr. Reynolds had "memory and concentration deficits [that] interfere significantly with remembering job instructions and performing job tasks"; (2) he was "limited to jobs which are hands-on and lower

skilled"; and (3) Mr. Reynolds had serious functional capacity loss and required "intensive and specialized training not required by the average worker to learn job tasks."

Dr. Rodriguez, a consulting psychologist, evaluated Mr. Reynolds twice, in November 2009 and December 2010. Based on these evaluations he completed two extensive reports, an RFC Evaluation (Mental), and two state disability forms. In his November 2009 evaluation, Dr. Rodriguez diagnosed Mr. Reynolds with major depression and anxiety disorder. He also concluded that Mr. Reynolds' depression and anxiety would last over twelve months and recommended further evaluation and assessment. At the second evaluation in December 2010, Dr. Rodriguez not only performed a clinical interview, but also administered the Folstein Mini-Mental Status Examination. Based on this interview and examination, Dr. Rodriguez again diagnosed Mr. Reynolds with major depression and anxiety disorder, as well as grief reaction. He also found that Mr. Reynolds suffered from psychosocial and environmental problems. Based on the examination, Dr. Rodriguez concluded that Mr. Reynolds was oriented, had intact long-term memory, the ability to register, process, and execute auditory information, and had intact social judgment. Additionally, he found that Mr. Reynolds did not have problems recalling words or reproducing geometric shapes. However, he noted that Mr. Reynolds had deficits in auditory memory, calculation ability, and abstraction ability. Ultimately, Dr. Rodriguez concluded that Mr. Reynolds' "ability to engage in basic work related activities including understanding, memory, sustained concentration, persistence and pace, social interaction and adaptation are significantly impaired due to his learning disabilities, history of special education classes, and his apparent significantly below average intellectual capabilities." This opinion was reflected in the RFC Evaluation (Mental), in which he noted marked or

extreme limitations in areas such as understanding and memory, sustained concentration and persistence, social interaction, and adaption.

Dr. Wharry, a psychologist, reviewed Mr. Reynolds' records and completed a Psychiatric Review Technique in May 2010, but concluded that there was insufficient evidence to assess the functional limitations caused by Mr. Reynolds' impairments.

Finally, Mr. Gard, a consulting occupational therapist, performed a functional capacity evaluation in November 2010.  After conducting various physical tests, he concluded that Mr. Reynolds was able to work at the light exertional level.

In the decision, the ALJ gave great weight to Dr. Benson's opinion and included limits in the RFC finding that directly reflect Dr. Benson's conclusions that Mr. Reynolds had difficulty in memory and concentration and was limited to lower skilled jobs.  The ALJ gave very little weight to Dr. Rodriguez's opinion, citing a lack of supporting evidence, his failure to administer intelligence or mental status tests, repetition between his two reports, the fact that the state disability forms offered an opinion on an issue reserved for the Commissioner, and conflicts with Mr. Reynolds' testimony and earnings record.

## IV.     Standard of Review

Judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than a preponderance.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  On appeal, a reviewing court's job is neither to "reweigh the

evidence nor substitute our judgment for that of the agency." *Branum v. Barnhart*, 385 f.3d 1268, 1270, 105 Fed. Appx. 990 (10th Cir 2004) (*quoting Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

The ALJ is required to consider the medical opinions in the record, along with the rest of the relevant evidence. 20 C.F.R. § 404.1527(b); § 416.927(b).[4]  When evaluating medical opinions, the medical opinion of an examining physician or psychologist is generally given more weight than the medical opinion of a source who has not examined the claimant.  The ALJ should evaluate an examining physician's medical opinion according to the factors outlined in § 404.1527.  Those applicable to an examining physician include:

> 1) the degree to which the physician's opinion is supported by relevant evidence; 2) consistency between the opinion and the record as a whole; 3) whether or not the physician is a specialist in the area upon which an opinion is rendered; and 4) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

§ 404.1527.

Having considered these factors, an ALJ must give good reasons in the decision for the weight assigned to a treating source's opinion.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Luttrell v. Astrue*, 453 Fed.Appx. 786, 794 (10th Cir. 2011) (unpublished).  The ALJ is not required to explicitly discuss all the factors outlined in § 404.1527.  *Oldham*, 509 F.3d at 1258; SSR 06-03p.  However, the ALJ must discuss not just evidence that supports the decision, but also "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (citation omitted).

"An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking

---

[4]  All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition.  Hereafter, the Court will only cite the pertinent Title II regulations governing disability insurance benefits, found at 20 C.F.R. Part 404, e.g § 404.1527.  The corresponding regulations governing supplemental security income under Title XVI, which are substantively the same, are found at 20 C.F.R. Part 416.

only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citations omitted).

At Step 4 in the disability analysis, the ALJ is also required to assess a claimant's RFC based on all relevant evidence, medical or otherwise. § 404.1545. As part of this evaluation, the ALJ must take into consideration all the claimant's symptoms, including subjective symptoms. § 404.1529(a). Subjective symptoms are those that cannot be objectively measured or documented. One example is pain, but there are many other symptoms which may be experienced by a claimant that no medical test can corroborate. By their nature, subjective symptoms are most often identified and described in the testimony or statements of the claimant or other witnesses.

In assessing subjective symptoms, the ALJ must consider statements of the claimant relative to objective medical evidence and other evidence in the record. § 404.1529(c)(4). If a claimant has a medically determinable impairment that could reasonably be expected to produce the identified symptoms, then the ALJ must evaluate the intensity, severity, frequency, and limiting effect of the symptoms on the claimant's ability to work. § 404.1529(c)(1); SSR 96-7p.

In the 10th Circuit, this analysis has three steps: 1) the ALJ must determine whether there is a symptom-producing impairment established by objective medical evidence; 2) if so, the ALJ must determine whether there is a "loose nexus" between the proven impairment and the claimant's subjective symptoms; and 3) if so, the ALJ must determine whether considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling. *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987).[5] The third step of the *Luna* analysis involves a holistic review of the record. ALJ must consider pertinent evidence including a claimant's

_____

[5] The ALJ need not follow a rote process of evaluation, but must specify the evidence considered and the weight given to it. *Qualls v. Apfel*, 206 F3d 1368, 1372 (10th Cir. 2000).

history, medical signs, and laboratory findings, as well as statements from the claimant, medical

or nonmedical sources, or other persons.  § 404.1529(c)(1).  In addition, § 404.1529(c)(3)

instructs the ALJ to consider:

> 1) [t]he individual's daily activities; 2) [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) [f]actors that precipitate and aggravate the symptoms; 4) [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms…; and 7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Inherent in this review is whether and to what degree there are conflicts between the

claimant's statements and the rest of the evidence.  *Id.*  Ultimately, the ALJ must make specific

evidentiary findings with regard to the existence, severity, frequency, and effect of the subjective

symptoms on the claimant's ability to work.  § 404.1529(c)(4).  This requires specific evidentiary

findings supported by substantial evidence.  *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir.

1988); *Diaz*, 898 F.2d at 777.

Finally, in the administrative review process, harmless error is applied with caution.

*Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).  Harmless error may be

appropriate where, based on material the ALJ considered, the court can confidently say that no

reasonable administrative factfinder, following the correct analysis, could have resolved the

factual matter in any other way.  *Id.*  Where the reviewing court can follow the ALJ's reasoning

and can determine that the correct legal standards were applied, "merely technical omissions in

the ALJ's reasoning do not dictate reversal."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166

(10th Cir. 2012).

V.      **Discussion**

**A. Dr. Benson's Opinion and The RFC Finding**

In the decision, the ALJ assigned Dr. Benson's medical opinion great weight and found

that Mr. Reynolds had the RFC to perform a full range of light work with the caveat that he was

limited to performing unskilled work with GED levels of Reasoning 2, Math 1, and Language 1.

Mr. Reynolds argues that the ALJ's RFC finding did not account for all the mental limitations

found in Dr. Benson's opinion.  The Commissioner responds that the ALJ's RFC finding did not

have to directly correspond with Dr. Benson's opinion.

Based on a psychological evaluation from August 20, 2010, Dr. Benson diagnosed Mr.

Reynolds with a learning disorder, borderline intellectual functioning personality disorder, and

prominent avoidant and schizotypal personality traits.  Dr. Benson concluded that Mr. Reynolds

had problems with memory and concentration that significantly limited his ability to perform

more complex job tasks and required "intensive and specialized training not required by the

average worker to learn job tasks."   The ALJ gave "great weight" to Dr. Benson's opinion and

included in the RFC finding several limitations from Dr. Benson's opinion.  The ALJ's finding

that Mr. Reynolds was limited to unskilled jobs that required only low-level reasoning,

mathematics, and language skills clearly incorporated Dr. Benson's opinion that Mr. Reynolds

was limited to low-skill work and had memory problems.  Additionally, the ALJ specifically

mentioned these aspects of Dr. Benson's opinion in the decision, referencing Dr. Benson's

conclusion that Mr. Reynolds had a "poor working memory, vocabulary and general fund of

information," and would "do best in unskilled or semi-skilled work."

Mr. Reynolds argues that the ALJ did not explicitly incorporate Dr. Benson's opinion

that Mr. Reynolds "requires intensive and specialized training not required by the average

worker to learn job tasks."  Beyond this general phrase, however, Dr. Benson offered no clarification or example.  Thus, it is somewhat unclear what type of job tasks and what capabilities he assumed the average worker would have.

Although the ALJ did not specifically discuss this particular aspect of Dr. Benson's opinion in the RFC finding, any oversight is harmless.  It is apparent that the ALJ considered Mr. Reynolds' need for training in determining that Mr. Reynolds could perform only unskilled work, and in setting limitations to GED levels of Reasoning 2, Mathematics 1, and Language 1.  Mr. Reynolds fails to show how Dr. Benson's opinion that Mr. Reynolds required "intensive and specialized training not required by the average worker to learn job tasks" would have resulted in a different RFC determination.  Thus the Court cannot conclude that a reasonable factfinder would have reached a different determination.  *Fischer-Ross*, 431 F.3d at 733.

### B.  The ALJ's Step 3 and RFC Findings

The Court next addresses the connection between the ALJ's Step 3 finding and RFC finding.  Although the ALJ found at Step 3 that Mr. Reynolds had moderate difficulties in concentration, persistence, and pace, these limitations were not explicitly reflected in the ALJ's RFC finding at Step 4.  Mr. Reynolds argues that the ALJ should have specifically included these limitations in the RFC finding.  The Commissioner argues that findings at Step 3 and Step 4 are distinct, and that the ALJ's RFC finding adequately accounted for Mr. Reynolds' limitations in concentration, persistence, and pace.

The Step 3 analysis is a determination as to whether the impairments found to be severe at Step 2 individually or in combination meet any of the impairments found in the Listings.  20 C.F.R. Part 404, Subpt. P, Appx. 1.  The Step 3 analysis is therefore guided by the wording of the applicable (or arguably applicable) Listings.  Although evidence other than objective medical

evidence can be considered at Step 3, it does not equate to findings made for purposes of

determination of the claimant's RFC at Step 4.  *See* § 404.1520(a)(4)(iii); § 404.1545(a)(1);

*Beasley v. Colvin*, 2013 WL 1443761, at *5 (10th Cir. 2013) (unpublished).

It is clear that the ALJ recognized this distinction between the findings made at Steps 3

and 4:

> The limitations identified in the "paragraph B" criteria are not a[n] [RFC]
> assessment but are used to rate the severity of mental impairments at steps 2 and
> 3….  The mental [RFC] assessment used at steps 4 and 5…requires a more
> detailed assessment by itemizing various functions contained in the broad
> categories found in paragraph B of the adult mental disorders listings in 12.00 of
> the [Listings].

This language is based almost verbatim on SSR 96-8p, which explains RFC assessments and

distinguishes between the analysis at Steps 3 and 4.  Given this distinction, the ALJ's Step 3

finding that Mr. Reynolds had moderate difficulties with regard to concentration, persistence, or

pace, the question is how they would have affected Mr. Reynolds' RFC.  Mr. Reynolds offers no

explanation as to how the severity assessment at Step 3 would have resulted in a different RFC.

Thus the Court finds no error.

### C.  Dr. Rodriguez's Opinion

The ALJ gave very little weight to Dr. Rodriguez's medical opinion for several reasons:

Dr. Rodriguez's opinion was not supported by the evidence and he failed to provide evidence in

support of his opinion; Dr. Rodriguez did not "administer any clinical intelligence or mental

status tests and, therefore, had no information on which to base his opinion"; Dr. Rodriguez's

two consultation reports were repetitious; Mr. Reynolds' testimony and past work record did not

support Dr. Rodriguez's opinion; and, finally, the state disability forms Dr. Rodriguez filled out

included opinions reserved for the Commissioner.

Mr. Reynolds raises two issues regarding the ALJ's consideration of Dr. Rodriguez's opinion.  Mr. Reynolds primary argument is that the ALJ's reasons for giving very little weight to Dr. Rodrigeuz's opinion were factually unsupported in the record.   Mr. Reynolds' second argument is derivative of his first.  He argues that the ALJ erred by adopting one aspect of Dr. Rodriguez's opinion, Mr. Reynolds' educational limits, while ignoring the remainder of Dr. Rodriguez's opinion.

The Commissioner responds that the ALJ's finding regarding Dr. Rodriguez's opinion is based on legitimate reasons, namely Dr. Rodriguez's failure to offer an explanation for his opinions as well as a lack of supporting evidence in the record.  According to the Commissioner, the ALJ did not have to include the functional limitations Dr. Rodriguez assigned to Mr. Reynolds in the RFC finding because the ALJ's reasons for discounting Dr. Rodriguez's opinion were valid.

As outlined above, Dr. Rodriguez examined Mr. Reynolds twice and completed several reports and state disability forms documenting the results. [6]  Based on his first examination, Dr. Rodriguez diagnosed Mr. Reynolds with major depression and an anxiety disorder, and concluded that these conditions would persist over twelve months and require further treatment. Based on his second examination, which included a Folstein Mini-Mental Status Examination, Dr. Rodriguez again concluded that Mr. Reynolds had depression and anxiety.  He also noted that Mr. Reynolds had some memory, calculation, and abstraction deficits that resulted in

---

[6]  Two of these were Colorado State Disability MED-9 forms which contain a single checkmark next to a statement that Mr. Reynolds was disabled.  No other information or opinion was contained on the form. To the extent these forms represent an opinion regarding the ultimate question of disability, these are opinions on an issue reserved for the Commissioner and are afforded no special weight.  *See* § 404.1527(d)(3).

"significant impairment" in his ability to perform basic work activities.  A mental RFC

evaluation completed with the December 2010 clinical interview mirrored these limitations.

The Court agrees with several of Mr. Reynolds' contentions.  Contrary to the ALJ's

finding, Dr. Rodriguez administered a mental status test, the Folstein Mini-Mental Status

Examination.  Additionally, the fact that Dr. Rodriguez's reports are repetitive is irrelevant to the

extent that they express the same opinion.  Finally, Dr. Rodriguez had no obligation to produce

evidence to support his opinion.[7]

However, several reasons the ALJ gave for assigning little weight to some of Dr.

Rodriguez's opinions do have merit.  Primary among these was the lack of evidence supporting

the functional limitations Dr. Rodriguez assigned to Mr. Reynolds.  Although Dr. Rodriguez

administered the Folstein Examination, he did not administer any other tests, including

intelligence tests.  The significant functional limitations Dr. Rodriguez outlined addressed Mr.

Reynolds' intelligence and social functioning in a work environment.  However, neither the

Folstein Exam nor his other reports reflect the degree of functional limitation he assigned Mr.

Reynolds.  According to Dr. Rodriguez's findings, Mr. Reynolds had intact long-term memory,

intact social judgment, and the ability to register, process, and execute auditory information.

Although he had limits on his auditory memory, calculation ability, and abstraction ability, he

did not have a problem recalling words and was able to reproduce geometric shapes when asked.

Additionally, Mr. Reynolds presented no treatment records and had a consistent work history up

until 2007.  While Mr. Reynolds testified that he was unable to work after 2007 due to medical

---

[7]  Instead, the ALJ had a duty to re-contact a medical source if a question arose regarding the
evidentiary basis for their report or opinion.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084
(10th Cir. 2004).  Although the ALJ did not re-contact Dr. Rodriguez personally, he did postpone
Mr. Reynolds hearing from November 2010 to March 2011 so that more medical information
could be obtained.  Among the additional evidence gathered was Dr. Rodriguez's second report,
based on the December 2010 clinical interview.

problems that affected his memory and concentration, the ALJ did not err when he discounted these statements, as explained in the next section.  Taken as a whole, the evidence does not support the significant functional limitation found by  Dr. Rodriguez.

Mr. Reynolds' also argues that the ALJ erred by including some but not all of Dr. Rodriguez's opinion in the RFC finding, citing *Chapo v. Astrue*, 682 F.3d 1285 (10th Cir. 2012) (ALJ erred by accepting part of a treating physician's opinion while rejecting the rest of the opinion without explanation).  Specifically, Mr. Reynolds argues that the ALJ rejected Dr. Rodriguez's opinion despite incorporating Mr. Reynolds' educational limitations.  However, unlike the ALJ in *Chapo*, here the ALJ explained why he gave little weight to most of Dr. Rodriguez's opinion.  While the ALJ may have adopted Mr. Reynolds' educational limitations in the RFC finding, the ALJ specifically rejected the significant functional limitations Dr. Rodriguez assigned to Mr. Reynolds, citing a lack of objective evidence, Mr. Reynolds' testimony, and Mr. Reynolds' work history.  To the extent the ALJ adopted part of Dr. Rodriguez's opinion, the ALJ explained why he rejected the rest of that opinion.  Nothing more is required.

### D.  Mr. Reynolds' Testimony

The Court next turns to the ALJ's assessment of Mr. Reynolds' statements regarding his subjective symptoms.  In the decision, the ALJ found that Mr. Reynolds' "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]."  The ALJ based this finding on the lack of medical treatment records, Mr. Reynolds' failure to seek treatment, and his work history.  The ALJ also noted that Mr. Reynolds' offered "no evidence of

any event, condition or occurrence that has taken place in the intervening period which would support a conclusion that he is unable to return to work activity."

Mr. Reynolds' argues that the ALJ did not properly assess his statements regarding his subjective symptoms.  He argues that the ALJ's finding is conclusory and not linked to the evidence, making review impossible.  The Commissioner responds that the ALJ's finding with regard to Mr. Reynolds' statements about his subjective symptoms is adequately supported by the lack of medical treatment records, Mr. Reynolds' failure to seek treatment, and the lack of objective medical evidence supporting his statements.

Mr. Reynolds testified that his memory, concentration, and social interaction problems prevented him from working.  Although he argues that the ALJ did not properly assess these statements, the Court finds no error in the ALJ's assessment.  The ALJ found that Mr. Reynolds' impairments "could reasonably be expected to cause some of the alleged symptoms," thus satisfying the first and second prongs of *Luna*.  The ALJ also found that the disabling effects of Mr. Reynolds were not as extensive as Mr. Reynolds asserted.  The ALJ specifically cited the lack of medical treatment evidence, Mr. Reynolds' failure to seek medical treatment, and his work history through 2007 in support of this finding.  These specific evidentiary findings satisfy the requirement of the third *Luna* prong.  There is no medical treatment evidence in the record to support Mr. Reynolds' statements.  Nor do the consulting psychologists' evaluations support his assertions.  Finally, Mr. Reynolds was able to work consistently until 2007.  Although he testified that he was unable to continue to work due to the onset of memory and concentration problems he connected with gasoline fumes, the ALJ reasonably discounted his statements based on the reasons outlined above.  Thus, the ALJ did not err in evaluating Mr. Reynolds' statements regarding his subjective statements.

For the forgoing reasons, the Commissioner of Social Security's decision is

**AFFIRMED**.  The Clerk shall enter a Judgment in accordance herewith.

DATED this 20th day of August, 2013/

BY THE COURT:

Marcia S. Krieger
United States District Judge